**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL GABRIEL PIQUION, 9+1 TRUCKING LLC, FORTY6 CLICKS TRANSPORTATION LLC, KC&R ENTERPRISE LLC, JAMES WILLIAMS, and RONALD FERGUSON, | ) ) ) ) ) | |
| | ) | No. 22 C 5690 |
| *Plaintiffs*, | ) ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| AMERIFREIGHT SYSTEMS LLC, AF SYSTEMS LLC, VALTRANS EXPRESS, INC., and RUMEN VALNEV, | ) ) ) | |
| | ) | |
| *Defendants*. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs Michael Gabriel Piquion, James Williams, Ronald Ferguson, 9+1 Trucking LLC, and Forty6 Clicks Transportation LLC, each hauled cargo for Amerifreight Systems LLC or AF Systems LLC as truck owner-operators or company drivers. KC&R Enterprise LLC did so indirectly through its agreement with a third party. Piquion also contracted with Amerifreight's truck-leasing affiliate, Valtrans Express, Inc. In this lawsuit, Plaintiffs bring claims under the Truth-in-Leasing Act (TILA), 49 U.S.C. § 14704, and Truth-in-Leasing regulations, 49 C.F.R. §§ 376 *et seq.*; the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq.*; the Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/1 *et seq.*; and for breach of contract. Defendants now move to dismiss or compel arbitration. (Dkt. 76). For the reasons below, the motion to compel arbitration is denied; the motion to dismiss is granted in part and denied in part.

1

# BACKGROUND

## A.      Piquion, Forty6 Clicks, and 9+1 Trucking v. Amerifreight

Amerifreight Systems and AF Systems (together, "Amerifreight"), both federally licensed motor carriers based in Illinois, transport goods for customers by contracting with truck owner-operators or lease operators. (Dkt. 68 ¶¶ 1, 18–19). Through an Independent Contractor Equipment Lease Agreement (the "Equipment Lease"), Michael Gabriel Piquion, who is a Georgia resident, Forty6 Clicks, and 9+1 Trucking each agreed to haul shipments under Amerifreight's motor-carrier licenses in exchange for a percentage of Amerifreight's gross revenue from the shipments hauled. (*Id.* at ¶¶ 2–3, 30–32; Dkt. 68-1 at 2–28, 46–79).[1] During their dealings with Amerifreight, these Plaintiffs each "had the right to exclusive use of their semi-trucks." (Dkt. 68 ¶ 34).

As to compensation, the Equipment Lease provides:

> The rates to be paid for Independent Contractor's services shall be rates individually negotiated for each bill of lading that is the responsibility of Amerifreight and each such rate shall be memorialized and confirmed on the Daily Trip Sheet; provided, in the event rate is not so memorialized the rate to be paid shall [sic] the rate last paid on such a service, or, if the service has not been previously provided, the rate shall be constructed from comparable rates.

(Dkt. 68 ¶ 31; Dkt. 68-1 at 16, 42, 59, 76). In addition, the Equipment Lease states: "Contractor have [sic] 30 days from date of settlement statement to dispute in writing any charge, discrepancies, deductions, fines, fees, reimbursements, advances, payments, wages, mileage rate(s), or load rate(s). After end [sic] of 30 days, it shall be affirmatively presumed that settlement statement is correct as issued." (Dkt. 68-1 at 8, 35, 52, 69).

Amerifreight did not negotiate rates with Plaintiffs nor memorialize rates on daily trip sheets. (Dkt. 68 ¶ 32). Rather, Amerifreight paid Plaintiffs 88% of the gross revenue from their

---

[1] Although Piquion dealt with Amerifreight Systems, and Forty6 Clicks and 9+1 Trucking dealt with AF Systems, Amerifreight Systems and AF Systems "operated interchangeably." (Dkt. 68 ¶¶ 36–37).

shipments each week. (*Id.* at ¶¶ 30, 32–33, 35). Plaintiffs received settlement statements from Amerifreight indicating payment at a rate of "0.88" of revenue from their loads. (*Id.* at ¶¶ 33, 58; *e.g.*, Dkt. 68-3).[2] Amerifreight also advertised on its social-media pages that "[o]wner-operators get 88% from each load" or "[e]arn 88% on each load." (Dkt. 68 ¶ 29; Dkt. 68-2 at 2, 5).

Plaintiffs allege Amerifreight underreported the gross revenue of its shipments and paid them based on the underreported amounts. (Dkt. 68 ¶¶ 7, 51). At least twice, Piquion learned from third-party brokers that Amerifreight had quoted him shipment prices that were lower than the actual amount that its customers paid. (*Id.* at ¶ 56). From browsing an online trucking marketplace called the "load board," Forty6 Clicks' owner and driver Ronald Ferguson, an Ohio resident, noticed that Amerifreight offered him "significantly lower" load prices than listings for comparable loads. (*Id.* at ¶¶ 16, 54). In reviewing rate-confirmation sheets that other carriers gave to their drivers, 9+1 Trucking's driver James Williams, also an Ohio resident, noticed "that the load prices were never a round dollar figure." (*Id.* at ¶¶ 14, 53). By contrast, Amerifreight "almost always" quoted shipment prices to James Williams as a "round dollar figure, and usually a multiple of $5 or $10." (*Id.*)

Amerifreight informed Plaintiffs of their shipments' gross revenue through phone, text, or email. (*Id.* at ¶ 39). But Amerifreight refused to give Plaintiffs copies of rated freight bills or brokers' rate-confirmation sheets for their shipments. (Dkt. 68 ¶¶ 6, 38–39, 53–55). So Plaintiffs could not verify Amerifreight's actual gross revenue from their shipments nor dispute potential

---

[2] Plaintiffs appended one settlement sheet to their complaint as an example. (Dkt. 68-3). Within the "Taxable Settlement Earnings" section, under the "Item Type" column, there are three entries called "Trip Settlmt (Revenue)." (*Id.*) Under the next column to the right, "QTY," there are three corresponding values: "1800," "1600," and "3800." (*Id.*) Under the "Rate" column, two columns further right, the sheet says "0.8800" three times. (*Id.*) Finally, two more columns to the right, under the "Amount" column, there are three dollar amounts: "$1,584.00," "$1,408.00," and "$3,344.00." (*Id.*) Each dollar amount in the Amount column is 88% of the corresponding value in the "QTY" column. (*See id.*) Below the "Taxable Settlement Earnings" section, the "Settlement Deductions" section totals various deductions, then reduces the total taxable earnings by the total deductions to reach a final settlement amount. (*Id.*)

underpayments. (*Id.* at ¶ 52). Upon terminating their contracts, Plaintiffs lost access to Amerifreight's online portal hosting their settlement statements. (*Id.* at ¶ 57).

In an August 2022 demand letter, Piquion requested rate-confirmation sheets for the loads he had hauled for Amerifreight. (*Id.* at ¶ 40; Dkt. 68-4). Amerifreight declined to send the documents but invited Piquion to review the rate-confirmation sheets and other documents in person at its Illinois headquarters. (Dkt. 68 ¶ 41; Dkt. 68-5). Plaintiffs' counsel then offered to visit Amerifreight's headquarters to review the documents on Piquion's behalf. (Dkt. 68 ¶ 42; Dkt. 68-6 at 3–4). But Amerifreight said no, insisting that only Piquion himself could review the documents. (Dkt. 68 ¶ 43; Dkt. 68-6 at 2).

**B.      KC&R v. Amerifreight**

Like the independent-contractor Plaintiffs, non-party West Trucks entered an Equipment Lease with Amerifreight. (Dkt. 68 ¶ 4; Dkt. 68-1 at 29–45). Rather than haul shipments itself, West Trucks leased a semitruck to Plaintiff KC&R in a separate lease-purchase agreement. (Dkt. 68 ¶¶ 5, 44). KC&R paid West Trucks $9,000 down and agreed to drive the semitruck under Amerifreight's motor-carrier license, hauling loads pursuant to West Trucks' Lease. (*Id.* at ¶¶ 5, 44–45). In exchange, West Trucks agreed to pass payments from Amerifreight to KC&R—taking $1,040 per week off the top. (*Id.* at ¶¶ 5, 46). Both West Trucks and Amerifreight promised to pay KC&R 88% of the revenue from each shipment. (*Id.* at ¶ 47). Amerifreight dispatched shipments to KC&R, and its dispatchers told KC&R the load prices by phone, email, and text message. (*Id.* at ¶ 48). KC&R learned from Amerifreight's dispatchers that Amerifreight paid West Trucks 88% of each shipment's revenue. (*Id.* at ¶ 49). Because Amerifreight underpaid KC&R, KC&R was "forced to terminate [its] lease-purchase agreement with West Trucks"—losing the money it had paid toward the truck. (*Id.* at ¶ 50).

C.     **Piquion v. Valtrans**

Piquion has an additional bone to pick with Amerifreight's truck-leasing affiliate company, Valtrans, also based in Illinois. (*Id.* at ¶ 20). Through a lease-purchase agreement—separate from his Lease—Piquion leased a semitruck from Valtrans. (*Id.* at ¶¶ 9, 62). The lease-purchase agreement gave Piquion the option to buy the semitruck after making weekly payments for two and a half years. (*Id.* at ¶ 9). Piquion paid Valtrans $398.17 per week toward the semitruck, and in September 2021, he paid $15,528.18 toward the remaining balance. (*Id.* at ¶ 63). On October 29, 2021, Valtrans confirmed in an executed bill of sale that Piquion had paid for the semitruck in full. (*Id.* at ¶ 65; Dkt. 68-7). Although the bill of sale reflects a sale price of $59,000, a settlement-detail summary shows that Piquion paid Valtrans $65,114 for the truck. (Dkt. 68 ¶ 65 & n.5; Dkt. 68-8). At the time, the truck's estimated retail and trade-in values were north of $100,000 and $88,000, respectively. (Dkt. 68 ¶ 65).

Despite the bill of sale, Valtrans did not transfer the semitruck title to Piquion—promising instead to do so by January 2022 "at the latest." (*Id.* at ¶¶ 10–11, 66). For ten months, Valtrans refused Piquion's repeated requests for the title. (*Id.*) Only upon receiving the August 2022 demand letter from Plaintiffs' counsel did Valtrans transfer the title. (*Id.* at ¶ 11; Dkt. 68-4). As a result of the ten-month delay, Piquion incurred "late registration fees and penalties, lost value of the truck, excess commercial auto insurance premiums, and lost opportunities to drive the truck for a different carrier." (Dkt. 68 ¶ 11). Since Piquion could not drive the semitruck for other carriers without the title, he continued driving for Amerifreight, whose payments—based on "significantly reduced load prices"—were sometimes too low to cover Piquion's fuel and maintenance costs. (*Id.* at ¶ 69). The title-transfer delay prevented Piquion from switching to a less expensive insurance policy than the one Amerifreight required. (*Id.* at ¶ 70). By the time Piquion received the title, the

semitruck's retail and trade-in values had dropped to around $70,000 and $60,000, respectively. (*Id.* at ¶ 74). In registering the title in his name, the delay between the bill-of-sale date and the title-transfer date triggered late fees and penalties. (*Id.* at ¶ 75).

**D.      Piquion, Williams & Ferguson v. Amerifreight & Valnev**

At times, Piquion, 9+1 Trucking's driver James Williams, and Forty6 Clicks' owner Ferguson worked directly for Amerifreight as company drivers. (*Id.* at ¶ 79). All three drivers agreed to the Amerifreight Rules and Regulations (the "Company Policy"), which includes policies on safety; maintenance; billing; payroll; penalties, fines, and rewards; and cellphone use. (Dkt. 76-7 at 2–10; Dkt. 76-8 at 2–10; Dkt. 76-9 at 2–10).[3] In the payroll section applicable to company drivers, the Company Policy states:

> We will hold an Escrow from each driver to cover the costs of unknown expenses, if driver leaves the company. For company driver we will hold $1000.00 Escrow, to be deducted from weekly settlements of $100.00 for 10 weeks. We will return your Escrow 45 days after your last check . . . .
>
> We will deduct Occupational Accident insurance – $30 weekly.

(Dkt. 76-7 at 6; Dkt. 76-8 at 6; Dkt. 76-9 at 6). Various other potential deductions and fines appear throughout the Company Policy, including "missing fuel receipt" ($20); "dropped trailer on asphalt" ($100); "changed appointment without Dispatchers permission" ($100); and "miscellaneous tickets" ($100–$500). (Dkt. 76-7 at 3–10; Dkt. 76-8 at 3–10; Dkt. 76-9 at 3–10).

As Amerifreight company drivers, Plaintiffs picked up and dropped off loads in Illinois, earning $0.50 to $0.60 per mile. (Dkt. 68 ¶¶ 80, 82). Amerifreight owned the trucks and equipment Plaintiffs used. (*Id.* at ¶ 81(a)). Amerifreight also "directed the Plaintiffs on all aspects of their

---

[3] On a motion to dismiss, the Court may consider "documents that are central to the complaint and are referred to in it." *O'Brien v. Village of Lincolnshire*, 955 F.3d 616, 621–22 (7th Cir. 2020) (quotation omitted); *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022); *see also Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Attached to Defendants' motion to dismiss are several contracts which are referenced in and central to Plaintiffs' operative complaint. These contracts are properly considered at this stage.

routes, including the times and locations to pick up trailers and loads, the specific routes they took to drive to delivery locations, and the times they were required to arrive at delivery locations." (*Id.* at ¶ 81(b); *see also, e.g.*, Dkt. 76-7 at 4 ("The company driver has no right to choose the loads.")). When Amerifreight paid Plaintiffs, it allegedly deducted, "among other things, escrow, occupational accident insurance, [and] violations, without obtaining their express written authorization." (Dkt. 68 at ¶ 83). Amerifreight's owner Defendant Rumen Valnev, an Illinois resident, "had authority over Amerifreight's policies and practices with regard to paying company drivers." (*Id.* at ¶¶ 21, 84). Valnev was aware of the deductions from Plaintiffs' paychecks, and he allowed them to continue. (*Id.* at ¶ 85).

### E.    Arbitration Agreements

Separate from the Equipment Lease, Piquion; 9+1 Trucking owner Tracy Williams and driver James Williams; Forty6 Clicks owner Ferguson; KC&R co-owners Deanthony Holman and Demetrius Jones; and West Trucks owner Gueorgui Dimitrov each signed an agreement—titled "Owner Operator & Leased Driver Agreement" (the "Ampersand Version" of the "Driver Agreement") or "Owner Operator/Leased Driver Agreement" (the "Slash Version")—containing an arbitration clause. (Dkt. 68 ¶¶ 13–17; Dkt. 76-3 at 2–4; 76-4 at 2–7; Dkt. 76-5 at 2–4; 76-6 at 2–4). The Driver Agreement has three parts. (Dkt. 76-3 at 2–4; Dkt. 76-4 at 2–7; Dkt. 76-5 at 2–4; Dkt. 76-6 at 2–4). In the Ampersand Version, both the independent contractors (Tracy Williams and Dimitrov) and drivers (James Williams, Holman, and Jones) signed Parts 1 and 3. (Dkt. 76-4 at 2, 4, 5, 7; Dkt. 76-5 at 2, 4). But only the drivers signed Part 2. (Dkt. 76-4 at 3, 6; Dkt. 76-5 at 3). In the Slash Version, the independent contractors (Piquion and Ferguson) signed all three parts. (Dkt. 76-3 at 2, 4; Dkt. 76-6 at 2, 4).

The arbitration clause appears in Part 2:

> This agreement shall be governed by the laws of the state of Illinois, both as to interpretation and performance other than injunctive or equitable relief, he parties agree that all matters will be submitted to binding arbitration, and action brought by either of the parties arising out of this agreement shall be commenced and maintained within the jurisdiction of the State of Illinois . . . . Each party is responsible for its own coast [sic] and expenses (including, but not limited to attorney fees and one half of the fees and expenses of the neutral arbitrator) incurred in enforcing its right under the arbitration process. The arbitrators are not empowered to award damages in excess of compensatory damages. . . . If any one or more of the provisions contained in the Agreement [sic] but the Agreement will be enforceable to the extent applicable.

(Dkt. 76-3 at 3; Dkt. 76-4 at 3, 6; Dkt. 76-5 at 3; Dkt. 76-6 at 3). Part 2 also states: "I agree with all conditions of this contract," and "I agree with all conditions and rules of [Amerifreight]." (Dkt. 76-3 at 3; Dkt. 76-4 at 3, 6; Dkt. 76-5 at 3; Dkt. 76-6 at 3).

Part 1 contains the substance of the Driver Agreement. At the outset, it provides that Amerifreight and the "Owner Operator – Independent Contractor" "are entering this independent contract used for the purpose of obtaining driving privileges with [Amerifreight] for" either the "driver for the independent contractor" (Ampersand Version) or the "independent contactor [sic]" (Slash Version). (Dkt. 76-3 at 2; Dkt. 76-4 at 2, 5; Dkt. 76-5 at 2; Dkt. 76-6 at 2). Each driver (Ampersand) or independent contractor (Slash) further agreed:

- that they are "not an employee of [Amerifreight]";

- that Amerifreight "is not liable for any personal injuries that the driver my [sic] receive while working for" the independent contractor or himself;

- that they are "not entitled to make any claims against the trucking company";

- to "perform contracted services in good and professional manner";

- that "[t]here will be no claims from the Leased driver against our Customers for personal injuries," unless the customer's employee causes an accident;

- to "read and understand all rules and regulations required by all local, state and federal laws";

8

- "if involved in an accident," to "notify dispatcher no later than two hours and present a written accident report within 24 hours following any such accident";

- "to cooperate with the company regarding" litigation; and

- that they are "responsible for any legal fees, unpaid insurance claims or personal lawsuits."

(Dkt. 76-3 at 2; Dkt. 76-4 at 2, 5; Dkt. 76-5 at 2; Dkt. 76-6 at 2).

As company drivers, Piquion, Ferguson, and James Williams each signed the Slash Version. (Dkt. 76-7 at 11–13; Dkt. 76-8 at 11–13; Dkt. 76-9 at 11–13).

## F.     The Present Motion to Dismiss

On October 17, 2022, Piquion sued Amerifreight (both Amerifreight Systems and AF Systems). (Dkt. 1). Subsequent complaints have tacked on the remaining parties and claims. (Dkts. 24, 36, 68). The operative Third Amended Complaint includes five counts. (Dkt. 68). In Count I, the independent-contractor Plaintiffs bring a claim against Amerifreight under the Truth-in-Leasing Act (TILA), 49 U.S.C. § 14704(a)(2). (*Id.* at ¶¶ 86–98). In Count II, KC&R claims Amerifreight violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq.* (*Id.* at ¶¶ 99–119). In Count III, Piquion asserts a breach-of-contract claim against Valtrans. (*Id.* at ¶¶ 120–25). In Count IV, Piquion brings an ICFA claim against Valtrans and Amerifreight. (*Id.* at ¶¶ 126–40). And in Count V, Piquion, Williams, and Ferguson claim Amerifreight and Valnev made improper deductions from their wages, in violation of the Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/1 *et seq.* (*Id.* at ¶¶ 141–46).

Defendants now move to dismiss. (Dkts. 76, 76-1). Their mishmash of arguments falls into three buckets. First, pursuant to Federal Rule of Civil Procedure 12(b)(1), they contend that the Court lacks subject-matter jurisdiction over KC&R's ICFA claim in Count II. (Dkt. 76-1 at 4). Second, Defendants challenge the sufficiency of Plaintiffs' claims under Rule 12(b)(6). (*Id.* at 4–

15). Third, in the alternative, Defendants seek to compel arbitration. (*Id.* at 7–8, 15). The Court will empty the third bucket before the second because the motion to compel arbitration, if successful, could take some of Plaintiffs' claims off the table. (Spoiler alert: it is not successful.)

## DISCUSSION

## I.    Supplemental Jurisdiction (Count II)

No doubt, the Court has federal-question jurisdiction over the independent-contractor Plaintiffs' TILA claim and supplemental jurisdiction over their state-law claims for breach of contract and violation of the ICFA. *See* 28 U.S.C. §§ 1331, 1367(a). Defendants contend, however, that the Court's supplemental jurisdiction does not extend to KC&R's ICFA claim against Amerifreight because KC&R itself "does not raise any other federal claims against [Amerifreight]." (Dkt. 76-1 at 4).[4] Supplemental jurisdiction is not so narrow.

Where there is "an independent basis for federal jurisdiction"—here, federal-question jurisdiction—the Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Interpreting

---

[4] KC&R does not invoke diversity jurisdiction, which requires complete diversity of citizenship and an amount in controversy over $75,000. 28 U.S.C. § 1332(a). For two reasons, the Court could not exercise diversity jurisdiction over KC&R's claim as pleaded. (*See* Dkt. 68). First, Plaintiffs have not properly alleged diversity of citizenship. An LLC has the citizenship of its members. *Qin v. Deslongchamps*, 31 F.4th 576, 579 (7th Cir. 2022). Although five parties here are LLCs—KC&R, 9+1 Trucking, Forty6 Clicks, Amerifreight Systems, and AF Systems— the Third Amended Complaint does not sufficiently allege the citizenship of all their members. (*See* Dkt. 68 ¶¶ 13, 15–19, 21). That makes a complete-diversity determination impossible. Second, even assuming diversity of citizenship, KC&R has not satisfied the amount-in-controversy requirement. To overcome the jurisdictional threshold, KC&R alone must plead damages over $75,000. *See Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 733 (7th Cir. 2021) (explaining that multiple litigants, in general, cannot reach the amount in controversy by aggregating their claims). Generally, courts accept a plaintiff's unchallenged, good-faith amount-in-controversy allegation "unless it 'appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount.'" *McMillian v. Sheraton Chi. Hotel & Towers*, 567 F.3d 839, 844 (7th Cir. 2009) (quotation omitted). Yet, where a defendant calls the amount in controversy into question, the plaintiff must support its amount-in-controversy allegation with "competent proof." *Id.* (quotation omitted). Here, KC&R alleges it lost payments toward the truck—a $9,000 down payment plus $1,040 per week for an unspecified number of weeks—and it received some amount less than promised for its shipments. (Dkt. 68 ¶¶ 44, 50, 117–19). KC&R has not attached a total dollar figure to its injuries. Although Defendants have challenged the amount in controversy, (Dkt. 76-1 at 4), KC&R has not offered any proof—"competent" or otherwise— that its damages exceed $75,000. *See McMillian*, 567 F.3d at 844.

the phrase "case or controversy," "[c]ourts often ask whether the claims share a common nucleus of operative fact." *Prolite Bldg. Supply, LLC v. MW Mfrs., Inc.*, 891 F.3d 256, 258 (7th Cir. 2018) (citing *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008)).

Generally, "a loose factual connection between claims" will suffice. *Id.* (quoting *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995)) (cleaned up); *see also McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 683 (7th Cir. 2014) (approving of supplemental jurisdiction over state-law claims that "arose from a subset of the [federal] antitrust allegations"). Claims against a common defendant do not always pass this test. *Compare Prolite*, 891 F.3d at 258–59 (holding retailer's contract claims against a manufacturer could not support supplemental jurisdiction over warranty claims by the retailer's customers where the manufacturer was the sole commonality), *with CNH Indus. Am. LLC v. Jones Lang LaSalle Ams., Inc.*, 882 F.3d 692, 704 (7th Cir. 2018) (observing that a manufacturer's contract claims provided supplemental jurisdiction over independent dealerships' claims under the same contract). Yet, supplemental jurisdiction is proper, for example, "when the supplemental claim involves the same parties, contracts, and course of action as the claim conferring federal jurisdiction." *Prolite*, 891 F.3d at 258 (collecting cases).

Here, the TILA and ICFA claims have a sufficient factual connection. In the TILA claim in Count I, the independent-contractor Plaintiffs assert that Amerifreight violated the Truth-in-Leasing regulations by refusing to give them copies of rated freight bills. (Dkt. 68 ¶¶ 86–98); *see* 49 U.S.C. § 14704(a)(2) (providing a cause of action for Truth-in-Leasing-regulation violations); 49 C.F.R. §§ 376.12, 376.12(g) (requiring lessors to provide copies of rated freight bills where "a lessor's revenue is based on a percentage of the gross revenue for a shipment"). At the heart of Count I is the allegation that "Amerifreight paid Plaintiffs less than they promised to pay them by

under-reporting the price of loads Plaintiffs hauled and then paying Plaintiffs the promised 88% of the lower, under-reported price." (Dkt. 68 ¶ 95).

In the same vein, KC&R's ICFA claim in Count II asserts that Amerifreight promised to pay KC&R, through West Trucks, 88% of the revenue from KC&R's shipments hauled, but Amerifreight underpaid KC&R by underreporting gross revenues. (*Id.* at ¶¶ 99–119). Beneath KC&R's grievance is Amerifreight's performance under its lease with West Trucks—an agreement that is identical in substance to Amerifreight's agreements with the independent-contractor Plaintiffs. (*See* Dkt. 68-1). Moreover, in support of the ICFA unfair-conduct claim, Count II relies on the TILA as a source of public policy.[5] Specifically, KC&R alleges that Amerifreight "violated established public policy, including the TILA, by paying KC&R less than their promised percentage of the load revenue." (Dkt. 68 ¶ 112). Amerifreight further offended public policy "by contracting with West Trucks instead of KC&R"—"intentionally circumventing the lease protections of the TILA." (*Id.* at ¶ 111).

At bottom, the claims in Count I and II involve the same conduct by the same defendants, stemming from the same contracts. *See Prolite*, 891 F.3d at 258. In both claims, Plaintiffs intend to prove that Amerifreight promised its independent contractors 88% of gross revenue, but it paid the independent contractors less than promised by underreporting gross revenues. KC&R's ICFA claim therefore arises from a critical subset of the TILA allegations. *See McCoy*, 760 F.3d at 683. The claims do not overlap perfectly, but that is not the test. There is an adequate "loose factual connection." *Prolite*, 891 F.3d at 258. And the allegations unique to the ICFA claim do not stretch that connection so thin as to break off into a distinct case or controversy. Nor does the Court see

---

[5] To determine whether conduct is unfair under the ICFA, courts consider, among other factors "whether the practice offends public policy." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 647 (7th Cir. 2019) (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002)).

any reason to decline to exercise its supplemental jurisdiction at this stage. *See* 28 U.S.C. § 1367(c). Thus, subject-matter jurisdiction over KC&R's ICFA claim is proper.

## II.     Motion to Compel Arbitration

Based on the arbitration clause in the Driver Agreement, Defendants move to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3). (Dkt. 76-1 at 1, 7–8, 15). Yet, "the doctrine of *forum non conveniens* is the correct procedural mechanism to enforce an arbitration clause." *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 701 (7th Cir. 2022) (quoting *Dr. Robert L. Meinders, D.C., Ltd. v. United Healthcare Servs., Inc.*, 7 F.4th 555, 560 (7th Cir. 2021)) (cleaned up); *see also Dr. Robert*, 7 F.4th at 561 (observing that the procedural vehicle—Rule 12(b)(3) versus *forum non conveniens*—"does not impact the substantive analysis").

The parties agree that Illinois law, including the Illinois Uniform Arbitration Act (IUAA), 710 ILCS 5/1 *et seq.*, governs the enforceability of the arbitration clause here—not the Federal Arbitration Act (FAA). (Dkt. 76-1 at 7–8; Dkt. 84 at 19); *see New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 541 (2019) (explaining that the FAA does not cover employment contracts of "workers engaged in interstate commerce," including truck drivers (quoting 9 U.S.C. § 1)). Yet, since the IUAA and FAA share "common origins," Illinois courts applying the IUAA "look for guidance to federal court decisions interpreting similar provisions of the [FAA]." *J & K Cement Constr., Inc. v. Montalbano Builders, Inc.*, 456 N.E.2d 889, 893 (Ill. App. Ct. 1983); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 214 n.3 (7th Cir. 1993) (noting that "federal and Illinois authorities are in accord" on issues of arbitration (quoting *N. Ill. Gas Co. v. Airco Indus. Gases*, 676 F.2d 270, 274–75 (7th Cir. 1982))).

The IUAA provides:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising

> between the parties is valid, enforceable and irrevocable save upon any such
> grounds as exist for the revocation of any contract . . . .

710 ILCS 5/1. In assessing the validity and scope of an arbitration agreement, general principles of contract formation apply. *Midland Funding, LLC v. Raney*, 93 N.E.3d 724, 731 (Ill. App. Ct. 2018) (citing *Vassilkovska v. Woodfield Nissan, Inc.*, 830 N.E.2d 619, 623 (Ill. App. Ct. 2005)); *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710–11 (7th Cir. 2019) (citing *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012)). As the party moving to compel arbitration, Amerifreight bears the burden of showing that the arbitration agreement is valid and that the dispute is within the agreement's scope. *Sturgill v. Santander Consumer USA, Inc.*, 48 N.E.3d 759, 767 (Ill. App. Ct. 2016) (citing *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 121 (Ill. App. Ct. 2005)).[6] Plaintiffs do not dispute the existence of a valid arbitration agreement. Rather, the sticking point is the agreement's scope.

Under Illinois law, parties "are bound to arbitrate only those issues they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions expressed in that language." *Liu v. Four Seasons Hotel, Ltd.*, 138 N.E.3d 201, 206 (Ill. App. Ct. 2019) (citing *Royal Indem. Co. v. Chi. Hosp. Risk Pooling Program*, 865 N.E.2d 317, 324 (Ill. App. Ct. 2007)). When an arbitration clause's language is broad—covering, for example, "any claim or controversy arising out of this agreement"—and it is not clear whether the dispute is within the agreement's scope, "the question of substantive arbitrability should initially be decided by the arbitrator." *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 530 N.E.2d 439, 447–48 (Ill. 1988). By contrast, when an arbitration clause is "clearly limited in scope," a court should resolve the

---

[6] A burden of proof is a matter of substantive, rather than procedural, law, so it is the rule of decision in the Court's application of Illinois contract law. *See USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 46 F.4th 571, 580 (7th Cir. 2022) (citing *Rompsen Mortg. Ltd. P'ship v. BGC Holdings LLC – Arlington Place One*, 20 F.4th 359, 369 (7th Cir. 2021)); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

arbitrability question. *United Cable Tele. Corp. v. Nw. Ill. Cable Corp.*, 538 N.E.2d 547, 550 (Ill. 1989) (distinguishing *Donaldson*).

Where, as here, the parties have multiple agreements—but only one includes an arbitration clause—and the plaintiff's claims stem from an agreement with no arbitration clause, "the parties can be compelled to arbitrate only if (1) the clause is broad enough to encompass their dispute, or (2) the agreement containing the clause incorporates the other by reference." *Gore*, 666 F.3d at 1033 (citing *Rosenblum v. Travelbybus.com Ltd.*, 299 F.3d 657, 662 (7th Cir. 2002)). Before evaluating the scope of the arbitration clause and the possibility of incorporation by reference, the Court considers the contracts' functions and their relationship to one another. *Rosenblum*, 299 F.3d at 663–65.

### A.    Comparison of the Agreements

Under the Driver Agreement, the drivers agreed to limit Amerifreight's liability in exchange for driving privileges. This agreement: provides driving privileges to the drivers, whether they are employees of independent contractors (Ampersand Version) or owner-operators (Slash Version); announces the drivers' status as independent contractors; requires the drivers to "perform contracted services in good and professional manner"; distributes risk and limits liability in the event of disputes between drivers and Amerifreight or its customers; and provides for arbitration of disputes "arising out of this agreement." (Dkt. 76-3 at 2–4; Dkt. 76-4 at 2–7; Dkt. 76-5 at 2–4; Dkt. 76-6 at 2–4).

Separately, through the Equipment Lease, Plaintiffs agreed to lease equipment to Amerifreight and haul shipments under Amerifreight's motor-carrier licenses in exchange for compensation. The Equipment Lease covers: performance and confidentiality obligations; use, possession, and maintenance of equipment; Plaintiffs' independent-contractor status; assumption

of risk, including insurance and indemnification; assignment; duration, cancellation, and termination; breach; waiver; inability to complete delivery; notices; and most importantly, compensation—the subject of all Plaintiffs' claims here. (Dkt. 76-3 at 5–21; 76-4 at 8–24; Dkt. 76-5 at 5–21; Dkt. 76-6 at 5–21). Further, the Equipment Lease expressly incorporates Schedule A (leased equipment); Schedule B (compensation); Schedule C (insurance); and a Supplement to Equipment Lease Agreement (independent-contractor status). (Dkt. 76-3 at 5, 13–21; Dkt. 76-4 at 8, 16–24; Dkt. 76-5 at 5, 13–21; Dkt. 76-6 at 5, 13–21).

In signing the Company Policy—also distinct from the Driver Agreement—the drivers agreed to perform their work pursuant to Amerifreight's policies. (Dkt. 76-7 at 2–10; Dkt. 76-8 at 2–10; Dkt. 76-9 at 2–10). Those policies cover safety; maintenance; billing; payroll; penalties, fines, and rewards; and cellphone use. (Dkt. 76-7 at 2–10; Dkt. 76-8 at 2–10; Dkt. 76-9 at 2–10). Relevant to the company-driver Plaintiffs' IWPCA claims, the Company Policy sets out fines and deductions, including for escrow, insurance, and policy violations. (Dkt. 76-7 at 6, 8–10; Dkt. 76-8 at 6, 8–10; Dkt. 76-9 at 6, 8–10).

Comparing the Equipment Lease and Driver Agreement, they are "are not two sections of the same agreement; they are separate, free-standing contracts." *See Rosenblum*, 299 F.3d at 663. The Equipment Lease and Driver Agreement do not refer to one another. Each contract is supported by adequate consideration; neither is missing terms that it must borrow from the other. *See id.* Indeed, the two contracts include some terms which would be superfluous if the agreements were one and the same. *See id.* The Company Policy likewise stands apart from the Driver Agreement: these agreements do not refer to one another, they are each supported by consideration, and neither contract must borrow terms from the other. *See id.*

Because the Driver Agreement was "used for the purpose of obtaining driving privileges," Amerifreight insists that the Driver Agreement's arbitration clause covers all "claims aris[ing] out of the provision of driving services, i.e., compensation for said services." (Dkt. 85 at 10). This attempted sleight of hand is unconvincing. Although "obtaining driving privileges" and providing "driving services" are related concepts, they are not the same: driving *services* flow from the independent contractor to Amerifreight; driving *privileges* run from Amerifreight to the driver. Nor does the Driver Agreement make any mention of compensation or deductions. Thus, the contracts stand alone. Nothing suggests the parties intended for the Driver Agreement's dispute-resolution terms to extend to disputes arising from the Equipment Lease or Company Policy.

## B.    Scope of the Arbitration Agreement

Focusing on the arbitration clause, it is not broad enough to reach Plaintiffs' claims. Appearing in Part 2 of the Driver Agreement, the clause provides:

> *This agreement* shall be governed by the laws of the state of Illinois, both as to interpretation and performance other than injunctive or equitable relief, the parties agree that all matters will be submitted to binding arbitration, and action brought by either of the parties *arising out of this agreement* shall be commenced and maintained within the jurisdiction of the State of Illinois . . . .

(Dkt. 76-3 at 3; Dkt. 76-4 at 3, 6; Dkt. 76-5 at 3; Dkt. 76-6 at 3 (emphases added)).

By its terms, the clause requires arbitration of disputes arising from the Driver Agreement. Attempting to stretch the arbitration clause further, Amerifreight wrenches the words, "the parties agree that all matters will be submitted to binding arbitration," from their context. (Dkt. 85 at 10). Sandwiching those words are two references to "this agreement"—limiting the clause's expanse. The clear language of the arbitration clause does not express an intent to arbitrate any dispute that could ever arise between the parties. In this action, Plaintiffs dispute their compensation and wage deductions, on which the Driver Agreement is silent. Applying the arbitration clause to

compensation disputes arising from the Equipment Lease or Company Policy "would expand the operation of that clause beyond its express terms and beyond the intent of the parties." *See Rosenblum*, 299 F.3d at 664.

### C. Incorporation by Reference

Neither the Equipment Lease nor the Company Policy incorporates the Driver Agreement and its arbitration clause by reference. "Mere reference to another contract or document is not sufficient to incorporate its terms into a contract." *Gupta*, 934 F.3d at 715 (quoting *Rosenblum*, 299 F.3d at 666). Rather, "there must be an express intent to incorporate." *Id.* (quoting *Rosenblum*, 299 F.3d at 666). Undercutting any such intent is the Driver Agreement's introductory sentence, stating that the parties "are entering *this independent contract* used for the purpose of obtaining driving privileges." (*E.g.*, Dkt. 76-3 at 2 (emphasis added)). That language reflects the parties' intent for the Driver Agreement to stand separate from other contracts. *See Rosenblum*, 299 F.3d at 664–65. The Equipment Lease and Company Policy do not even reference the Driver Agreement—let alone, convey intent to incorporate it.

Resisting that conclusion, Amerifreight points to the following language in the Driver Agreement: "I agree with all conditions and rules of [Amerifreight]." (Dkt. 85 at 10). This covenant, Amerifreight argues, shows incorporation because the Equipment Lease "set out the rules and conditions within which the parties operated." (*Id.*) That is a stretch. Even if the cited language clearly referenced either the Equipment Lease or the Company Policy, mere reference is not enough. *See Rosenblum*, 299 F.3d at 665–66. Without express intent to incorporate, the Driver Agreement's arbitration clause cannot apply to disputes arising from separate contracts.[7]

---

[7] Plaintiffs raise three further arguments opposing arbitration: (1) 9+1 Trucking, Forty6 Clicks, and KC&R did not sign the Driver Agreement; (2) the arbitration clause is substantively unconscionable; and (3) Piquion cannot afford to arbitrate. (Dkt. 84 at 21–25). The Court need not reach these arguments. The Court also notes that Defendants have not pointed to any arbitration agreement between Piquion and Valtrans.

### III.  Failure to State a Claim

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in Plaintiffs' complaint as true, "drawing all reasonable inferences in [their] favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

### A.  Truth-in-Leasing Act (TILA) (Count I)

In Count I, the independent-contractor Plaintiffs (Piquion, Forty6 Clicks, and 9+1 Trucking) bring TILA claims against Amerifreight. The Truth-in-Leasing regulations "impose restrictions on lease agreements between motor carriers and owner-operators of trucks." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 678 (7th Cir. 2022). These regulations aim "to promote full disclosure between the carrier and owner-operator in the leasing contract, to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry, and to eliminate or reduce opportunities for skimming and other illegal practices." *Id.* (quoting 43 Fed. Reg. 29812, 29812 (July 11, 1978)). When a motor carrier violates Truth-in-Leasing regulations, the TILA allows owner-operators to sue for damages. 49 U.S.C. §§ 14102, 14704(a)(2); *Brant*, 43 F.4th at 678 (citing *Owner-Operator Independent Drivers Ass'n v. Mayflower Transit*, 615 F.3d 790, 791–92 (7th Cir. 2010)). To state a claim under the TILA, Plaintiffs must allege that (1)

Amerifreight violated one or more Truth-in-Leasing regulations, and (2) they suffered damages as a result. *Brant*, 43 F.4th at 678. Amerifreight challenges Plaintiffs' claims on both prongs. (Dkt. 76-1 at 5–6).

### 1.    Section 376.12 Violations

Plaintiffs assert that Amerifreight violated 49 C.F.R. § 376.12(g) (and § 376.12's introductory language) by failing to provide copies of rated freight bills. In pertinent part, § 376.12(g) states:

> When a lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the authorized carrier will give the lessor, before or at the time of settlement, a copy of the rated freight bill, or, in the case of contract carriers, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill.

49 C.F.R. § 376.12(g); *see also id.* at § 376.12 ("The required lease provisions shall be adhered to and performed by the authorized carrier."). Section 376.12(g)'s "disclosure requirement protects owner-operators from unscrupulous carriers who might be tempted to hide such information, to underpay for the shipment, and to pocket the difference." *Brant*, 43 F.4th at 679.

Initially, Amerifreight argues that 9+1 Trucking is not an "owner-operator" because its owner, Tracy Williams, is not herself a commercially licensed truck driver, while 9+1 Trucking's driver, James Williams, is not an owner. (Dkt. 76-1 at 6–7). Amerifreight offers neither authority nor reasoning to support its stance. Among other "lease requirements," § 376.12 provides: "The lease shall be made between the authorized carrier and the owner of the equipment." 49 C.F.R. § 376.12(a). The Truth-in-Leasing regulations define a "lease" as "[a] contract or arrangement in which the owner grants the use of equipment, *with or without driver*, for a specified period to an authorized carrier for use in the regulated transportation of property, in exchange for

20

compensation." 49 C.F.R. § 376.2(e) (emphasis added). Section 376.12's requirements—including § 376.12(g)—apply regardless of whether the owner-lessor is a driver.

Further, an "owner" is "[a] person (1) to whom title to equipment has been issued, or (2) who, without title, has the right to exclusive use of equipment, or (3) who has lawful possession of equipment registered and licensed in any State in the name of that person." 49 C.F.R. § 376.2(d). Plaintiffs have adequately alleged that 9+1 Trucking was an owner because it "had the right to exclusive use" of its truck during its dealings with Amerifreight. (Dkt. 68 ¶ 34); *see* 49 C.F.R. § 376.2(d)(2). Thus, Amerifreight's position ignores the text of the Truth-in-Leasing regulations and would arbitrarily excise certain owners from TILA's protections.

Next, Amerifreight argues that it did not violate § 376.12(g) because the Equipment Lease does not base Plaintiffs' payment on a percentage of gross revenue for their shipments. (Dkt. 76-1 at 5). To assess this argument, the Court must interpret the Equipment Lease. In construing contracts under Illinois law,[8] courts "aim to 'ascertain the parties' intent' by first consulting 'the plain and ordinary meaning of the contract language.'" *Page v. Alliant Credit Union*, 52 F.4th 340, 346 (7th Cir. 2022) (quoting *E. Coast Ent. of Durham, LLC v. Hous. Cas. Co.*, 31 F.4th 547, 550 (7th Cir. 2022)). "If the language of an alleged contract is ambiguous regarding the parties' intent, the interpretation of the language is a question of fact which a court cannot properly determine on

---

[8] In their arguments on the Equipment Lease's meaning, the parties both rely on Illinois law. (Dkt. 84 at 7–9; Dkt. 85 at 2–3). At least one court in this District, taking a cue from caselaw interpreting employee benefit plans under the Employee Retirement Income Security Act, has interpreted a similar lease under federal common law. *See Owner-Operator Indep. Drivers Ass'n v. Bulkmatic Transp. Co.*, 503 F. Supp. 2d 961, 967 (N.D. Ill. 2007) ("[B]ecause this lease must comply with the federal regulations applicable to authorized motor carriers as set forth in 49 C.F.R. § 376.12, this Court finds that it should be construed in accordance with federal common law and general rules of contract interpretation." (citing *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419 (7th Cir. 1998))). *But see Stampley v. Altom Transp., Inc.*, 2016 WL 4905673, at *2 n.3 (N.D. Ill. Sept. 15, 2016) ("There is no authority in this circuit supporting federal preemption in interpreting the terms of a contract concerning motor-carrier leases." (citing *Walker v. Trailer Transit, Inc.*, 824 F.3d 688, 689 (7th Cir. 2016)); *Mervyn v. Nelson Westerberg, Inc.*, 76 F. Supp. 3d 715, 721 (N.D. Ill. 2014) (applying state law). There is no indication that the applicable law will make a difference here. *See Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429, 431 (7th Cir. 1994) ("Federal common law rules of contract interpretation parallel equivalent state rules." (quotation omitted)). So for now, the Court assumes without deciding that Illinois law applies.

21

a motion to dismiss." *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 526 (7th Cir. 2022) (quoting *Quake Constr., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990)). At this stage, the Court interprets the Equipment Lease with the pleading standard in mind— accepting Plaintiffs' factual allegations as true and reading the complaint and appended contract documents in Plaintiffs' favor. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 737 (7th Cir. 2002).

> Against that backdrop, the Equipment Lease's payment provision states:

> The rates to be paid for Independent Contractor's services shall be rates individually negotiated for each bill of lading that is the responsibility of Amerifreight and each such rate shall be memorialized and confirmed on the Daily Trip Sheet; provided, in the event rate is not so memorialized the rate to be paid shall [sic] the rate last paid on such a service, or, if the service has not been previously provided, the rate shall be constructed from comparable rates.

(Dkt. 68 ¶ 31; Dkt. 68-1 at 16, 42, 59, 76).

Amerifreight did not negotiate rates with Plaintiffs, and it did not memorialize rates on daily trip sheets. (Dkt. 68 ¶ 32). Since the rate was "not so memorialized," under the contract's plain language, Amerifreight agreed to pay Plaintiffs "the rate last paid" for their services. (*See id.* at ¶ 31). Amerifreight paid Plaintiffs 88% of the gross revenue from their shipments each week. (*Id.* at ¶¶ 30, 32–33, 35). Amerifreight also gave Plaintiffs settlement sheets indicating payment at a rate of "0.88" of revenue from their shipments. (*Id.* at ¶¶ 32–33, 58; *e.g.*, Dkt. 68-3). That rate— 88% of gross revenue—according to Plaintiffs, was "the rate last paid on such a service." (Dkt. 68 ¶ 32; Dkt. 84 at 8).

Amerifreight sees things differently. It contends that the payment rate was "the individually negotiated rate for each bill of lading." (Dkt. 86 at 2–3). This argument asks the Court to reject Plaintiffs' allegation that Amerifreight did not memorialize individually negotiated rates in daily trip sheets. (*See* Dkt. 68 ¶ 32). No dice. At a later stage, Plaintiffs will need to back up their version of events. For now, the Court accepts Plaintiffs' well-pleaded factual allegations as true. *See 188*

*LLC*, 300 F.3d at 737. That principle extends to Plaintiffs' allegation that Amerifreight, in fact, purported to pay them 88% of gross revenue. (Dkt. 68 ¶¶ 32–33). The settlement sheet attached to Plaintiffs' complaint—which appears to calculate payment at a rate of 88% of the revenue for each shipment (Dkt. 68-3)—supports the reasonable inference that Amerifreight agreed to pay Plaintiffs 88% of the gross revenue from their loads. Although Amerifreight is correct that the word "gross" does not appear on the settlement sheet, (Dkt. 85 at 3), the word "revenue" does. (Dkt. 68-3).

"Revenue" means "[i]ncome from any and all sources"—that is, "gross income or gross receipts." *Revenue*, Black's Law Dictionary (11th ed. 2019); *see also City of Dallas v. F.C.C.*, 118 F.3d 393, 395 (5th Cir. 1997) ("The phrase 'gross revenue' has a generally accepted meaning: unless expressly limited by the terms of a statute, regulation or contract, gross revenue means all amounts received from operation of a business, without deduction."); *Stampley*, 2016 WL 4905673, at *4. Construing the settlement sheet in Plaintiffs' favor, "revenue" could plausibly refer to "gross revenue"—especially in context. After calculating 88% of the revenues from each trip, the settlement sheet reduces the total earnings by various deductions, (Dkt. 68-3), implying that the values in the "QTY" column corresponding with each trip's "revenue" describe "all amounts received from [Plaintiffs' shipments], *without deduction*." *See City of Dallas*, 118 F.3d at 395 (emphasis added).

In its reply brief, Amerifreight objects that Plaintiffs' reading of "the rate last paid on such a service" contradicts "industry practice" and "just doesn't make sense." (Dkt. 85 at 3).[9] Even if "the rate last paid" is ambiguous, a motion to dismiss is not the proper vehicle for a factual dispute over how extrinsic evidence may color its meaning. *See Kap*, 55 F.4th at 526; *cf. 188 LLC*,

---

[9] Amerifreight elaborates, without authority, that "the rate last paid on such a service" "accounts for situations where the carrier themselves has to calculate the linehaul rate, as not all loads have corresponding neat prices on their bills of lading. When a carrier has a contracted line with a shipper, for example, it is the carrier's responsibility or the broker, to calculate and bill the shipper." (*Id.* at 3–4).

300 F.3d at 738–39 (refusing to resolve whether terms were printed on the reverse side of a contract). All the extrinsic evidence on the record—including the settlement sheet and Amerifreight's social-media advertisements that "[o]wner-operators get 88% from each load"—supports Plaintiffs' plausible reading of "the rate last paid on such a service." (Dkt. 68-3; Dkt. 68-2 at 2, 5). Nothing contradicts the allegation that Amerifreight agreed to pay Plaintiffs a percentage of gross revenue. Amerifreight cannot cut Plaintiffs off at the pass with its unsupported say-so on industry custom. Plaintiffs allege further that Amerifreight refused to provide copies of rated freight bills or the equivalent information at or before the time of settlement. (Dkt. 68 ¶¶ 6, 38–39, 53–56, 94); *see Brant*, 43 F.4th at 678–79. Thus, Plaintiffs' allegations give rise to a plausible inference that Amerifreight violated §§ 376.12 and 376.12(g).

### 2. Damages

Plaintiffs also plausibly allege that Amerifreight's Truth-in-Leasing violation caused damages. Plaintiffs claim that Amerifreight underreported its gross revenue from Plaintiffs' shipments and paid them a percentage of those deflated amounts. (Dkt. 68 ¶¶ 7, 51). They support the theory with three well-pleaded factual allegations: First, third-party brokers told Piquion that the shipment prices Amerifreight had quoted him were lower than the amounts Amerifreight received from its customers. (*Id.* at ¶ 56). Second, Ferguson of Forty6 Clicks noticed that, compared to listings for similar loads on the "load board" online trucking marketplace, Amerifreight had quoted him "significantly lower" load prices. (*Id.* at ¶ 54). Third, 9+1 Trucking driver James Williams observed Amerifreight "almost always" quoted him prices as a "round dollar figure," while other carriers never did. (*Id.* at ¶ 53). These allegations permit a plausible inference that Amerifreight paid Plaintiffs less than they promised.

Without help from any caselaw, Amerifreight describes Plaintiffs' allegations as "implausible," "speculative," "vague," "questionable," "absurd," "open-ended," and "void of any indicia of reliability." (Dkt. 76-1 at 5–6). Rhetoric aside, Amerifreight expects too much at the pleading stage. In isolation, the allegation that Amerifreight underreported its gross revenue would border on speculative. Yet, the remaining factual allegations nudge Plaintiffs' theory of harm across the plausibility threshold. While Amerifreight faults Plaintiffs for failing to specify which brokers gave Piquion intel about load prices and which load board Ferguson visited, Plaintiffs need not plead their TILA claim with particularity. The absence of detail is not a fatal shortcoming.

Moreover, because Amerifreight refused to give Plaintiffs copies of rated freight bills or brokers' rate-confirmation sheets, Plaintiffs could not verify Amerifreight's gross revenue from their shipments. (Dkt. 68 at ¶¶ 6, 38–39, 52–56). Without that information, it is hard to imagine how Plaintiffs could state their claim in greater detail. Section 376.12(g) exists for this very purpose: the regulation aims to prevent motor carriers from underpaying drivers while ensuring they are never the wiser. *See Brant*, 43 F.4th at 679 ("Without [§ 376.12(g)'s] requirement that this information be made available before settlement, drivers . . . might never know if they were being underpaid."). Thus, in *Brant*, the plaintiff stated a TILA claim with less detailed allegations than those here. *Cf. id.* (plaintiff adequately alleged harm from a § 376.12(g) violation by pleading that (1) the defendant "did not provide Plaintiff . . . with copies of documents from which the rates and charges . . . are computed," (2) the defendant "underpaid Plaintiff," and (3) "the failure to disclose the rated freight bill or equivalent information to [the plaintiff] prevented him from contesting the alleged underpayment").

Despite Amerifreight's contention, the Equipment Lease's 30-day dispute window does not prevent Plaintiffs from pleading damages. (*See* Dkt. 76-1 at 9–10). The Equipment Lease

provides: "Contractor have [sic] 30 days from date of settlement statement to dispute in writing any charge, discrepancies, deductions, fines, fees, reimbursements, advances, payments, wages, mileage rate(s), or load rate(s). After end [sic] of 30 days, it shall be affirmatively presumed that settlement statement is correct as issued." (Dkt. 76-3 at 11; Dkt. 76-4 at 14; Dkt. 76-5 at 11; Dkt. 76-6 at 11). In Amerifreight's view, this clause precludes Plaintiffs from disputing payments under the Equipment Lease because they received settlement statements more than 30 days before contesting Amerifreight's compliance with the TILA. That view is mistaken.

Amerifreight looks for support in *Mervyn v. Atlas Van Lines, Inc.*, 882 F.3d 680 (7th Cir. 2018), and *Stampley v. Altom Transport, Inc.*, 958 F.3d 580 (7th Cir. 2020). In both *Mervyn* and *Stampley*, the Seventh Circuit held that contractual 30-day dispute windows warranted summary judgment for defendant-carriers on plaintiff-owner-operators' claims for breach of contract and violations of TILA, § 376.12(d).[10] *Mervyn*, 882 F.3d at 684–86; *Stampley*, 958 F.3d at 586–89. Both cases are readily distinguishable.

To start, the 30-day clauses in *Mervyn* and *Stampley* used different language from the clause here. In *Mervyn* the clause stated: "Financial entries made by [carrier] on payment documents shall be *conclusively* presumed correct if not disputed by [owner-operator] within 30 days after distribution." *Mervyn*, 882 F.3d at 684 (emphasis added). The plain language of that clause created an irrebuttable presumption that barred the carrier from challenging the correctness of payment documents beyond the 30-day window. *Id.* at 684–85 ("Something that is conclusively presumed correct cannot be rebutted."); *see also Presumption*, Black's Law Dictionary (11th Cir. 2019) (defining a "conclusive presumption" or "irrebuttable presumption" as one "that cannot be

---

[10] Section 376.12(d) provides: "The amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease." 49 C.F.R. § 376.12(d). Plaintiffs have not alleged a violation of this Truth-in-Leasing regulation.

overcome by any additional evidence or argument because it is accepted as irrefutable proof that establishes a fact beyond dispute").

In contrast, the 30-day clause here creates an "affirmative[]" presumption. (*E.g.*, Dkt. 76-3 at 11); *see also Presumption*, Black's Law Dictionary (11th Cir. 2019) (observing that presumptions generally "shift[] the burden of production or persuasion to the opposing party, who can then attempt to overcome the presumption"); John D. Lawson, *The Law of Presumptive Evidence* 639 (2d ed. 1899) ("A 'presumption' is a rule of law that courts or juries shall or may draw a particular inference from a particular fact or from particular evidence, unless and until the truth of such inference is disproved."). "Affirmative" does not mean irrebuttable. *See Affirmative*, Black's Law Dictionary (11th ed. 2019) (defining "affirmative" as "[s]upporting the existence of certain facts"); *see also, e.g.*, *Ga. Ry. & Elec. Co. v. City of Decatur*, 295 U.S. 165, 171 (1935) (describing a presumption interchangeably as "affirmative" and "rebuttable"); *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1041–42 (11th Cir. 1998) (observing that an "affirmative presumption" is rebuttable). To drive the point home, consider how "affirmative" and "conclusive" differently modify the word "evidence": while *conclusive* evidence ends an inquiry, *affirmative* evidence is vulnerable to conflicting evidence. *See, e.g.*, *Callanan v. Hurley*, 93 U.S. 387, 389–91 (1876) (distinguishing "conclusive evidence" from "affirmative" or "*prima facie* evidence"); *Henderson v. George Wash. Univ.*, 449 F.3d 127, 138–39 (D.C. Cir. 2006) (explaining that "affirmative evidence" "is not necessarily *conclusive* affirmative evidence" (emphasis added)).

Also distinguishable from the present clause, *Stampley*'s 30-day clause provided: "[The owner-operator] shall have thirty (30) days from receipt to contest, in writing, the information contained on any rated freight bill or computer-generated document. Following this (30) day period, [the owner-operator] shall waive all rights to contest the validity or accuracy of any/all

27

payments made . . . ." *Stampley*, 958 F.3d at 587. Effecting a total waiver of any right to contest payment after 30 days, *Stampley*'s clause was similar in effect to *Mervyn*'s—leaving no room for rebuttal. *Id.* at 588 (citing *Mervyn*, 958 F.3d at 588). The clause in the Equipment Lease is not so forceful. It does not waive Plaintiffs' rights. Nor does it create any presumption—affirmative, conclusive, or otherwise—that Plaintiffs received the information Amerifreight owed them under § 376.12(g). Amerifreight's harsh construction of the 30-day clause thus ignores important features of the clauses that warranted summary judgment in *Mervyn* and *Stampley*.

Importantly, in both *Mervyn* and *Stampley*, the owner-operators received all the information they needed to dispute payments within the 30-day window. *Mervyn*, 882 F.3d at 685; *Stampley*, 958 F.3d at 588. But here, Plaintiffs allege that they did not receive rated freight bills or the equivalent information—a failing at the heart of this case. Nor did the Equipment Lease specify when Plaintiffs would receive rated freight bills, as § 376.12(g) requires. By allegedly withholding rated freight bills and omitting mention from the Equipment Lease of Plaintiffs' entitlement to the information, Amerifreight ensured that Plaintiffs could not dispute any underpayment. Worse, Plaintiffs allege that Amerifreight misrepresented its gross revenue on settlement sheets. Even *Stampley* acknowledged that a carrier's fraud could excuse a failure to contest payment within a contractual 30-day dispute window. *Stampley*, 958 F.3d at 588–89 & n.5 ("[I]f . . . underlying documents were fabricated or altered to mislead [the carrier], that would likely significantly change our analysis.").

The Seventh Circuit distinguished *Stampley* along similar lines in *Brant*, stressing:

Section 376.12(g) is a disclosure mandate that protects owner-operators by requiring that the lease disclose the availability of information useful to ensure the carrier does not shortchange the driver at settlement. The lease must specify *when* this information is to be made available, and then the carrier must provide it or be in breach of contract. Because [the carrier] did not clarify in the [lease] when this information would be available—i.e., at or before settlement—[the owner-

operator] allegedly did not know that one of the significant disclosure protections
provided him by the Truth-in-Leasing regulations was being violated.

*Brant*, 43 F.4th at 679. Although *Brant* did not involve a 30-day dispute window, its interpretation
of § 376.12(g) cautions against a too-expansive reading of *Mervyn* and *Stampley*—particularly at
the pleading stage. Therefore, the independent-contractor Plaintiffs' TILA claims survive.

### B.    Illinois Consumer Fraud Act (ICFA) (Counts II & IV)

In Counts II and IV, KC&R and Piquion claim Amerifreight and Valtrans violated the
ICFA. Seeking dismissal of the ICFA claims, Defendants argue that KC&R and Piquion are not
"consumers" and have failed to allege a "consumer nexus." (Dkt. 76-1 at 4–5, 8–9; Dkt. 85 at 6–
9). The ICFA "protect[s] consumers, borrowers and business persons against fraud, unfair methods
of competition, and other unfair and deceptive business practices." *McIntosh v. Walgreens Boots
Alliance, Inc.*, 135 N.E.3d 73, 80 (Ill. 2019) (citing *Robinson v. Toyota Motor Credit Corp.*,
775 N.E.2d 951, 960 (Ill. 2002)); *see also Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d
803, 822 ("Illinois courts have interpreted the ICFA to apply not only in consumer-against-
business cases but also in some cases when 'both parties to the transaction are business entities.'"
(quoting *L. Offs. of William J. Stogsdill v. Cragin Fed. Bank for Sav.*, 645 N.E.2d 564, 566–67 (Ill.
App. Ct. 1995))). To state an ICFA claim, the plaintiff must be a "consumer," as the Act defines
that term, or satisfy the consumer-nexus test by showing a "nexus between the complained of
conduct and consumer protection concerns." *Cmty. Bank of Trenton*, 887 F.3d at 823 (quoting
*Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 437 (7th Cir. 1996)). Plaintiffs here have
done neither.

A "consumer" under the ICFA is "any person who purchases or contracts for the purchase
of merchandise not for resale in the ordinary course of his trade or business but for his use or that

of a member of his household." 815 ILCS 505/1(e).[11] Attempting to squeeze into this definition, KC&R and Piquion contend that they contracted with Defendants for "dispatching and load-finding services." (Dkt. 84 at 9–10). This argument ignores the definition's critical limitation: a consumer must purchase or contract for services for personal use—not for a business purpose. *See, e.g.*, *Lee v. AAA Freight, Inc.*, 2023 WL 3200255, at *4 (N.D. Ill. May 2, 2023) (plaintiffs were not consumers because they did "not allege that they purchased defendants' products for their personal use"); *Rivers v. Southway Carriers, Inc.*, 2023 WL 5348809, at *2–3 (N.D. Ill. Aug. 20, 2023) (same). In similar case, Judge Gettleman put it aptly:

> If plaintiffs could use their status as independent contractors to argue that they are consumers under the ICFA, then every independent contractor would be a consumer of the benefits of their employment. This is implausible. Plaintiffs contracted with defendants as independent contractors; any benefit that plaintiffs received from defendants' services, including dispatching, was contemplated by their business relationship.

*Lee*, 2023 WL 3200255, at *4; *cf. Hess v. Kanoski & Assocs.*, 668 F.3d 446, 454 (7th Cir. 2012) (plaintiff had no viable ICFA claim since he "was an employee, not a 'consumer'"). Since Plaintiffs did not contract for dispatching services for personal use, they are not consumers.

Nor have Plaintiffs satisfied the consumer-nexus test. "Illinois courts are skeptical of business-v.-business ICFA claims when neither party is actually a consumer in the transaction." *Cmty. Bank of Trenton*, 887 F.3d at 823. To show that a defendant's conduct implicates consumer-protection concerns, a plaintiff must plead "(1) that [its] actions were akin to a consumer's actions to establish a link between [it] and consumers; (2) how defendant's representations . . . concerned consumers other than [plaintiff]; (3) how defendant's particular [action] involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers."

---

[11] A "person" may be a natural person or business entity, *id.* § 505/1(c), and "merchandise" includes services, *id.* § 505/1(b).

*Bonilla v. Ancestry.com Operations Inc.*, 574 F. Supp. 3d 582, 596 (N.D. Ill. 2021) (quoting *Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 912 (N.D. Ill. 2012)); *Brody v. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 698 N.E.2d 257, 269–70 (Ill. App. Ct. 1998).

Plaintiffs assert that "Defendants regularly advertised their owner-operator opportunities on social media aimed at the general market of truck drivers." (Dkt. 84 at 10; *see also* Dkt. 68 ¶¶ 29, 102, 104). Yet, the market of commercial truck drivers is not a market of "consumers"; it is a market of potential independent contractors. *See Athey*, 89 F.3d at 437; *see also First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1039–40 (7th Cir. 1989) (observing that Illinois courts "look beyond the effect of the immediate scheme on the putative victim to determine whether a class of consumers was affected"). Courts in this District routinely reject arguments like Plaintiffs'. *See, e.g.*, *Our Pet Project LLC v. Int'l Paper Co.*, 2023 WL 143224, at *4 (N.D. Ill. Jan. 10, 2023) (finding allegations of conduct directed at business purchasers—rather than consumers—could not support a consumer nexus); *Biggers Holdings LLC v. Garcia*, 2022 WL 3107617, at *6 (N.D. Ill. Aug. 4, 2022) ("[T]he mere fact that an allegedly deceptive or misleading advertisement appears on the Internet is not sufficient to show a consumer nexus. . . . [Plaintiff] must provide some explanation as to why the advertisement was directed to consumers and not just at other business entities." (citing *Onvi, Inc. v. Radius Project Dev., Inc.*, 2020 WL 4607242, at *5 (N.D. Ill. Aug. 11, 2020))); *Tile Unltd., Inc. v. Blanke Corp.*, 788 F. Supp. 2d 734, 739–40 (N.D. Ill. 2011) ("The complaint alleges only that Defendants' false representations . . . were directed to Tile Unlimited 'and other tile installers,' not to consumers." (distinguishing *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 41 (Ill. App. Ct. 1989))). With neither consumers nor a consumer nexus in sight, Piquion's and KC&R's ICFA claims fail.

### C.     Breach of Contract (Count III)

In Count III, Piquion raises a breach-of-contract claim against Valtrans. In Piquion's telling, which the Court accepts as true, he leased a semitruck from Valtrans through a lease-purchase agreement. Piquion paid off the semitruck in full, triggering Valtrans's obligation to transfer the title to Piquion. But for ten months, Valtrans refused to do so. Due to that delay, Piquion alleges he incurred "late registration fees and penalties, lost value of the truck, excess commercial auto insurance premiums, and lost opportunities to drive the truck for a different carrier." (Dkt. 68 ¶ 11, 69, 70, 74–75). These allegations add up to a plausible breach-of-contract claim. *See Nat'l Collegiate Student Loan Tr. 2007-2 v. Powell*, 206 N.E.3d 1134, 1142 (Ill. App. Ct. 2022) ("The elements of a breach-of-contract cause of action include the existence of a valid and enforceable contract, performance by the plaintiff, breach of the contract by the defendant, and resultant damages or injury to the plaintiff." (quotation omitted)); *see also, e.g.*, *Grabowski v. Dunkin' Brands, Inc.*, 2017 WL 6059966, at *3 (N.D. Ill. Dec. 7, 2017).

In cursory form, Valtrans contends that Piquion has failed to plead damages "with any remote particularity." (Dkt. 76-1 at 10). Valtrans suggests that Piquion could not have incurred damages from its alleged breach because he "made in excess of $280,000" in 2021. (*Id.*) Then, in its reply brief, Valtrans suggests that Piquion's alleged "lost opportunity to drive for another carrier" is "entirely speculative as to whether he would have earned more or less money driving elsewhere." (Dkt. 85 at 9). Valtrans's challenge to Piquion's claim is devoid of support: Valtrans cites only one case (in its reply brief), which says nothing of the pleading standard for damages. (*Id.* at 9 (citing *1472 N. Milwaukee, Ltd. v. Feinerman*, 996 N.E.2d 652, 658–61 (Ill. App. Ct. 2013) (upholding trial court's damages award)). By failing to develop this argument, Valtrans has waived it. *See Wernstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005); *Bradley v. Village of*

*University Park*, 59 F.4th 887, 897 (7th Cir. 2023); *see also Campos v. Cook County*, 932 F.3d 972, 976 n.2 (7th Cir. 2019) ("Parties waive arguments which they develop for the first time in a reply brief." (citation omitted)).

On the merits, Valtrans's argument reflects a fundamental misunderstanding of the pleading standard: for claims "rest[ing] on allegations of deceptive conduct," Rule 9(b) requires plaintiffs to "plead with particularity the circumstances constituting fraud." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quoting *Vanzant Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019)); Fed. R. Civ. P. 9(b). Piquion need not plead damages—or any other element of his breach-of-contract claim—with particularity. Even if Piquion's lost-opportunity allegations were "speculative," Valtrans has not disputed Piquion's other well-pleaded theories of damages stemming from Valtran's alleged breach.

Valtrans's point about Piquion's 2021 earnings is puzzling. Even if Piquion's supposed financial success could somehow negate his claim for damages—a dubious position—Valtrans asks the Court to consider whose side of the story seems right. Engaging with this request would flout the pleading standard. *See, e.g.*, *Bahena v. Aahil Corp.*, 2022 WL 4609620, at *3 (N.D. Ill. Sept. 30, 2022) ("The Court cannot at this early stage accept as true facts that are outside the four corners of the pleadings or draw from those facts inferences unfavorable to Plaintiff . . . ." (quoting *Brack v. Dart*, 2013 WL 2251741, at *3 (N.D. Ill. May 22, 2013))). Accordingly, Piquion's breach-of-contract claim survives.

### D.    Illinois Wage Payment and Collection Act (IWPCA) (Count V)

Finally, in Count V, Piquion, Ferguson, and James Williams bring IWPCA claims against Amerifreight and Valnev for improper deductions. The IWPCA "provide[s] employees with a cause of action for the timely and complete payment of earned wages or final compensation."

*Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016) (quoting *Byung Moo Soh v. Target Mktg. Sys., Inc.*, 817 N.E.2d 1105, 1107 (Ill. App. Ct. 2004)). In pertinent part, "the IWPCA prohibits employers from taking deductions from employees' wages unless the deductions are '(1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; [or] (4) made with the express consent of the employee, given freely at the time the deduction is made.'" *Id.* (quoting 820 ILCS 115/9); *Johnson v. Diakon Logistics, Inc.*, 44 F.4th 1048, 1050 (7th Cir. 2022).

Defendants first argue that the IWPCA does not apply to non-Illinois residents. (Dkt. 76-1 at 11–12). Second, Defendants contend that the challenged deductions were proper. (*Id.* at 12–14).[12] Neither argument is persuasive.

### 1.    Application of the IWPCA to Non-Illinois Residents

The IWPCA "applies to all employers and employees in [Illinois]." 820 ILCS 115/1. In *Glass v. Kemper*, the Seventh Circuit held that IWPCA does not permit claims by non-Illinois residents who have performed no work in the state. 133 F.3d 999, 1000 (7th Cir. 1998). Driving that conclusion was the Act's "evident purpose . . . to protect employees *in Illinois* from being stiffed by their employers." *Id.* (citing 820 ILCS 115/14, and *Mueller Co. v. Dep't of Lab.*, 543 N.E.2d 518, 521 (Ill. App. Ct. 1989)). Plus, "a state's attempt to regulate a transaction wholly in foreign commerce would violate the 'negative' commerce clause." *Id.* at 1001.

Revisiting the IWPCA's geographic expanse in *Adams v. Catrambone*, the Seventh Circuit clarified that "nonresidents of Illinois who work in that state for an in-state employer may qualify

---

[12] In Defendants' brief supporting the motion to dismiss, they suggest that the IWPCA claims against Amerifreight and Valnev rise and fall together. (*See* Dkt. 76-1 at 15 ("To the extent that the Plaintiffs do not have a cause of action against [Amerifreight], their claim also fails against . . . [Valnev].")). For the first time on reply, however, Defendants contend that Plaintiffs' allegations about Valnev's authority over Amerifreight policies are deficient. (Dkt. 85 at 14). That argument is waived as underdeveloped. *See Wernstein*, 422 F.3d at 477 n.1; *Campos*, 932 F.3d at 976 n.2.

as employees" under the IWPCA. 359 F.3d 858, 863–64 (7th Cir. 2004) (distinguishing *Glass*, and reasoning, "if the employee performs his work in Illinois, he is an employee in Illinois"). *Adams* also leaned on the IWPCA's purpose: "to protect employees *in Illinois* from being stiffed by their employers." *Id.* at 863 (quoting *Glass*, 133 F.3d at 1000). Indeed, the IWPCA's application to nonresidents who work for an in-state employer is so clear, the *Adams* Court saw no need to look beyond the statute itself. *Id.* at 864.

More recently, in *Watts v. ADDO Management, L.L.C.*, the Illinois Appellate Court ruled that the IWPCA's "application is not limited to any specific quantum of work performed in Illinois." 97 N.E.3d 75, 80–82 (Ill. App. Ct. 2018) (citing 56 Ill. Admin. Code § 300.440(d)). Following *Watts*, several courts in this District have allowed IWPCA claims by employees who worked partially in Illinois. *See, e.g.*, *Tsibikov v. Dovgal*, 2023 WL 42029823, at *2 (N.D. Ill. June 15, 2023); *Prokhorov v. IIK Transp., Inc.*, 2023 WL 2711599, at *4 (N.D. Ill. Mar. 30, 2023); *Yata v. BDJ Trucking Co.*, 2018 WL 3303290, at *4–5 (N.D. Ill. July 5, 2018). At the pleading stage, plaintiffs "need only plead that they have done *some* work for an Illinois employer while physically present in Illinois." *Cline v. FitzMark Chi., Inc.*, 2023 WL 2711615, at *6 (N.D. Ill. Mar. 30, 2023) (quoting *Niiranen v. Carrier One, Inc.*, 2022 WL 103722, at *3 (N.D. Ill. Jan. 11, 2022)). Plaintiffs have done so here by alleging that, as company drivers, they picked up and dropped off loads in Illinois. (*See* Dkt. 68 ¶ 82).

If Plaintiffs did not perform enough work in Illinois to recover under the IWPCA, that is an argument more fitting for a summary-judgment motion. *Id.* (quoting *Niiranen*, 2022 WL 103722, at *3); *see also Baxi v. Ennis Knup & Assocs., Inc.*, 2011 WL 3898034, at *14 (N.D. Ill. Sept. 2, 2011) ("If the facts adduced in discovery indisputably show that Plaintiff did not perform sufficient work in Illinois to warrant coverage under the Wage Act, [the defendant] may raise this

argument on summary judgment."); *cf. Cohan v. Medline Indus., Inc.*, 170 F. Supp. 3d 1162, 1175 (N.D. Ill. 2016) (granting summary judgment for employer on IWPCA claims where the employees spent only a few days per year in Illinois for training).

### 2.    Improper Deductions

Turning to the sufficiency of Plaintiffs' allegations of improper deductions, their claims pass muster. Plaintiffs allege that Amerifreight made deductions for escrow, occupational accident insurance, and violations of company policies. (Dkt. 68 ¶ 83; *see also* Dkt. 84 at 7, 20). As Defendants see it, these deductions were all proper because (1) Plaintiffs consented to the deductions; or (2) the deductions benefitted Plaintiffs. (Dkt. 76-1 at 12–14).[13]

The IWPCA permits deductions with the "express written consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9(4). According to an Illinois Department of Labor (IDOL) regulation implementing the IWPCA—in effect at the time of the deductions at issue—written consent for ongoing deductions is "given freely" only if the "written agreement provides for [the] period of time [that deductions will occur], provides for the same amount of deduction each period[,] and allows for voluntary withdrawal for the deduction."[14] *Balderrama-*

---

[13] As an afterthought, Defendants suggest without support that some deductions were "tailored to promulgate the regulations of the Federal Motor Carrier Safety Administration." (Dkt. 76-1 at 14). In their reply, they similarly contend that some deductions were "intended to promulgate [Department of Transportation] regulations." (Dkt. 85 at 17). To the extent Defendants mean to imply that some deductions were "required by law," *see* 820 ILCS 115/9(1), the argument is waived as underdeveloped. *See Wernstein*, 422 F.3d at 477 n.1; *Campos*, 932 F.3d at 976 n.2.

[14] An amended version of § 300.720(b) became effective in March 2023, providing:

> When a deduction is to continue over a defined duration of time and the written agreement provides for that defined duration of time and provides for the same amount of deduction each pay period, the agreement shall be considered to be given freely at the time the deduction is made. No agreements for a defined duration of time shall last longer than six months.

56 Ill. Admin. Code § 300.720(b) (2023). Although neither side takes a clear position on the issue, the current version of the regulation likely does not apply retroactively. *See Perry v. Dep't of Fin. & Prof. Reg.*, 106 N.E.3d 1016, 1027 (Ill. 2018) (observing that the absence of clear legislative intent creates a presumption against retroactive application of statutes). The Court therefore assumes without deciding that the 2014 version of § 300.720 applies, since it was in effect at the time of the alleged improper deductions. *See Hill v. Cargo Runner Co.*, 2023 WL 6213674, at *15 (N.D. Ill. Sept. 23, 2023) (applying 2014 version of § 300.720(b)). Even if the 2023 version has retroactive effect, the

*Baca v. Clarence Davids & Co.*, 2019 WL 1057193, at *6 (N.D. Ill. Mar. 6, 2019) (quoting 56 Ill. Admin. Code § 300.720(b) (2014)); *see Andrews v. Kowa Printing Corp.*, 838 N.E.2d 894, 903 (Ill. 2005) (explaining that IDOL regulations are "an informed source for guidance when seeking to ascertain the legislature's intention when the [IWPCA] was enacted" (quotation omitted)).

Nothing in the Company Policy suggests that Plaintiffs could have voluntarily withdrawn from the challenged deductions. (*See, e.g.*, Dkt. 76-7 at 3–10). Thus, Plaintiffs' written consent to deductions for escrow, occupational accident insurance, and policy violations did not suffice under IDOL regulation § 300.720(b) and the IWPCA, § 115/9(4). *See Balderrama-Baca*, 2019 WL 1057193, at *6; *Hill*, 2023 WL 6213674, at *15. Attempting to show otherwise, Defendants rely on *Bell v. Bimbo Foods Bakeries Distribution, Inc.*, 2013 WL 6253450 (N.D. Ill. Dec. 3, 2023), and *Osorio v. The Tile Shop, LLC*, 2016 WL 316941 (N.D. Ill. Jan. 27, 2016). (*See* Dkt. 76-1 at 13–14). Both cases are distinguishable. In *Bell*—a summary-judgment decision predating the promulgation of the applicable IDOL regulation—the district court found that the disputed deductions never exceeded the amount the plaintiff had authorized. *Bell*, 2013 WL 6253450, at *5. Similarly, in *Osorio*, the district court found that the plaintiff adequately consented to deductions where he "knew exactly how much of each paycheck he would be required to give up." *Osorio*, 2016 WL 316941, at *2. Yet, neither *Bell* nor *Osorio* discusses § 300.720(b)'s voluntary-withdrawal requirement.

Nor have Defendants established that any of its deductions were for Plaintiffs' benefit. Defendants argue that the occupational accident insurance deductions benefitted Plaintiffs because, "should an incident occur, Plaintiffs have coverage for lost work and medical expenses."

---

Company Policy provides for some deductions with no "defined duration of time" or that could apply inconsistently between pay periods. *See* 56 Ill. Admin. Code § 300.720(b) (2023). Regardless of which version applies, therefore, Plaintiffs have alleged ongoing deductions without adequate written consent.

(Dkt. 76-1 at 14).[15] But IDOL regulation § 300.820 authorizes deductions for losses arising from damaged property only with "the employee's expressed written consent." *See* 56 Ill. Admin. Code § 300.820; *Kolev v. Nat'l Freight, Inc.*, 2023 WL 3033572, at *7 (D.N.J. Apr. 20, 2023) (refusing to dismiss IWPCA claims over the defendant's argument that escrow and insurance deductions benefitted the plaintiffs); *cf. Balderrama-Baca*, 2019 WL 1057193, at *5 (applying similar reasoning to the IDOL regulation governing deductions for uniforms).

At a later stage, it may become clear that certain deductions benefitted Plaintiffs. *Cf. Bell*, 2013 WL 6253450, at *4 (finding challenged "deductions benefitted [the plaintiff] because they were convenient"—a fact the plaintiff had acknowledged in a deposition). *But see See Torres v. Nation One Landscaping, Inc.*, 2016 WL 7049048, at *5 (N.D. Ill. Dec. 5, 2016) (rejecting administrative convenience alone as a benefit); *accord Kolev*, 2023 WL 3033572, at *7. But that is not yet clear. Thus, Piquion's, Ferguson's, and James Williams's IWCPA claims survive.

---

[15] For the first time on reply, Defendants suggest that the escrow deductions were also for Plaintiffs' benefit. (Dkt. 85 at 15–16). That argument comes too late, and so, is waived. *See Campos*, 932 F.3d at 976 n.2.

## **CONCLUSION**

For the reasons above, Defendants' motion to dismiss [76] is granted in part and denied in part. Defendants' motion to compel arbitration is denied. KC&R's and Piquion's ICFA claims in Counts II and IV are dismissed without prejudice for failure to state a claim. Plaintiffs' remaining claims in Count I (TILA), Count III (breach of contract), and Count V (IWPCA) may move forward consistent with this Opinion. Defendants' motion to stay oral discovery pending the resolution of their motion to dismiss [88] is denied as moot.

Virginia M. Kendall
United States District Judge

Date: November 21, 2023